Sewell v. Umsted.

## Opinion delivered December 21, 1925.

1. REFORMATION · OF INSTRUMENTS—SUFFICIENCY OF EVIDENCE.—To obtain reformation of a deed for a mutual mistake, it is not essential that the testimony be undisputed which tends to show that the plaintiff is entitled to the relief, but the testimony must show clearly and unmistakably that a mutual mistake was made whereby the deed which was executed did not reflect the real intention of either party.

2. REFORMATION OF INSTRUMENTS—EVIDENCE.—Evidence *held* clear and unmistakable that a mutual mistake was made in describing land in a deed, justifying reformation of the deed.

3. EVIDENCE—STATEMENTS OF GRANTOR BEFORE EXECUTION OF DEED.—In a suit to reform the description in a deed on the ground of a mutual mistake, the admission of statements made by the grantor before execution of the deed tending to prove such mistake did not violate the rule that prior writings and oral statements are deemed to be merged in the written contract, as that rule has no application where agreements are executed through mutual mistakes.

4. WITNESSES—SUIT AGAINST DECEASED GRANTOR'S HEIRS—GRANTEE AS WITNESS.—In a suit to reform the description in the deed of a deceased grantor against his heirs, the grantee's testimony did not violate Crawford & Moses' Dig., § 4144 (Const. sched. § 2), the suit not being against the executor or administrator of the grantor.

5. REFORMATION OF INSTRUMENTS—LACHES.—A suit against a grantor's heirs to reform a description in a deed for a mutual mistake was not barred by laches, though the grantor was dead and the land had greatly increased in value by the discovery of oil, where the land which defendants claim was intended to be conveyed had also increased in value, and had been leased by the grantor for oil and gas.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

*Powell, Smead & Knox* and *Thos. W. Hardy,* for appellant.

*T. J. Gaughan, J. T. Sifford, J. E. Gaughan* and *E. E. Godwin,* for appellee.

SMITH, J.   On April 14, 1917, Albert Berry owned the west half of the northwest quarter and the northwest

quarter of the southwest quarter of section 33, township 15 south, range 15 west, and on that date he executed a deed for one of these forty-acre tracts of land to Sid Umsted. The deed described the land conveyed as the southwest quarter of the northwest quarter section 33, township 15 south, range 16 west. Later oil was discovered in the vicinity of these lands, and Umsted, the grantee in the deed, who was a large landowner, began to have his titles examined and perfected with the view to making them merchantable. He had abstracts of title made to his lands, and he submitted to his attorney for examination an abstract of the title to the southwest quarter of the northwest quarter of section 33, township 15 south, range 16 west. An examination of the abstract disclosed that Umsted's grantor had no title whatever to this land, whereupon Umsted, so he alleged in his complaint, discovered for the first time that the deed had not only erroneously described the land as being range 16, when the range should have been stated as 15, but the deed had erroneously described the land conveyed as the southwest quarter of the northwest quarter of section 33, whereas the land purchased and which should have been described was the northwest quarter of the southwest quarter of section 33.

Upon these allegations Umsted prayed the court to reform the deed to conform to the intention of the parties, and from a decree awarding the relief prayed is this appeal.

The tract of land owned by Berry at the time of the execution of the deed in question was described by the witnesses as being three forties long and one forty wide, that is, the land extended three-fourths of a mile north and south and one-fourth of a mile east and west.

It is Umsted's contention that he bought the south forty-acre tract, whereas the deed conveyed the middle forty, leaving one forty north and the other forty south of the land described in the deed.

At the time of the execution of this deed none of the land was very valuable, and the south forty was the

lowest and least valuable, but Umsted testified that he bought this south forty because it had a good building site on it, and adjoined land which he already owned. The middle forty described in the deed did not join any land which Umsted owned.

The county surveyor testified that on the 14th and 15th of September, 1917, he made, at the request of Umsted, a survey of the northwest quarter of the southwest quarter of section 33, and at the same time made a survey of an adjoining forty which Umsted owned. He made no survey of the middle forty.

A witness named Joyce testified that he was present when the trade between Umsted and Berry was made, and the land then agreed to be sold was referred to by both parties as the extreme south forty.

A witness named Hirsch testified that he applied to Berry for an oil lease on the 120-acre tract, and that he purchased from Berry a lease on the west half northwest quarter section 33, but Berry declined to give a lease on the south forty, that is the northwest quarter southwest quarter, for the reason then stated that he had previously sold that land to Umsted.

Allen Fotch testified that he had been for many years a neighbor of Berry, and that Berry discussed the sale of the south forty with him and told him he was going to sell the south forty to pay his debts, and later Berry told him he had sold the south forty to Umsted. This witness also testified that, after Berry told him he had sold the south forty, Umsted had rails made, and that Umsted cut and removed timber from that tract.

Frank Murphy testified that Berry told him he had sold the south forty to Umsted.

Frank Griffin testified that he had applied to Berry to buy the northwest quarter of the southwest quarter of section 33, but Berry told him he had already sold that tract to Umsted.

Sam Bennett testified that Berry told him he had sold the south forty to Umsted, and that Umsted made rails

on this forty soon after buying a tract of land from Berry.

John Young testified that he kept books for Umsted at Umsted's sawmill, and that, while he was so employed, checks were issued to pay for the labor of cutting logs on the northwest quarter southwest quarter section 33, but nothing was paid as stumpage.

Umsted testified that all the land was low, but there was a good building site on the northwest quarter southwest quarter, and he wanted the land on that account to keep any one from building on it, and that this land cornered at a place where he had a gate in a fence around a tract of land which he then owned. Neither of the other two forties owned by Berry adjoined his land. After buying this south forty he employed Berry to assist in cutting rails and poles on that land, and he paid Berry for so doing.

The deed in question was prepared by Joe Cook, a justice of the peace, from a tax receipt which Berry furnished him to secure the description. Umsted testified that both he and Berry told Cook that the land to be described was the south forty, and that after the deed was written and acknowledged before Cook it was delivered to Cook to file for record, and Umsted never read the deed until the error in the description was discovered, when the abstract was examined.

Cook testified that he prepared the deed from a tax receipt given him by Berry, and that both Umsted and Berry pointed out on the tax receipts the land to be described in the deed, and that he wrote into the deed the description which had been pointed out to him. He admitted, however, that in preparing the deed he had erroneously written the range as 16 west, when it should have been range 15 west.

It appears that a suit was brought in the chancery court, which involved an oil lease on the southwest quarter of the northwest quarter of section 33, and an intervention was filed by Umsted in this suit in which he claimed to own that tract of land by virtue of the con-

veyance thereof to him from Berry. This intervention was filed September 16, 1922. This pleading was explained by Mr. T. J. Gaughan, who prepared and filed it for Umsted. Mr. Gaughan testified that Umsted told him he had bought Berry's south forty, and the witness, in preparing this pleading, was under the impression that Berry owned only two forty-acre tracts, the two together comprising the west half of the northwest quarter, the south forty of which would, of course, be described as the southwest quarter of the northwest quarter, and when witness discovered a little over two weeks later that Berry had owned three—and not two—forty-acre tracts, he dismissed the intervention and brought the suit to reform the original deed from Berry to Umsted so that, when reformed, it would convey the south forty, which is correctly described as the northwest quarter of the southwest quarter.

It was also shown that after the execution of the deed sought to be reformed Umsted paid the taxes on the lands described in the deed, and not on the northwest quarter of the southwest quarter; but Umsted testified that he paid taxes from his deeds and did not make any examination of the descriptions to verify their accuracy, and did not discover the error until shortly before the time when this suit was brought.

To obtain a reformation of a deed, it is not essential that the testimony be undisputed which tends to show that the party asking that relief is entitled to it; but it is essential that the testimony, in its entirety, show clearly and unmistakably that a mutual mistake was made whereby the deed which was executed did not reflect the real intention of either party.

One of our early cases on the quantum of proof essential to reform a deed is that of *McGuigan* v. *Gaines*, 71 Ark. 614, in which Mr. Justice RIDDICK, speaking for the court, said that to establish a mistake the evidence must be clear, unequivocal and decisive, and this court has since adhered to that statement of the law in granting or in denying relief by way of reformation. The difficulty

in each case is to determine whether the testimony measures up to this requirement.

Without further reviewing the testimony, we announce our conclusion to be that the testimony set out above meets the requirement stated by Mr. Justice RIDDICK, and fully justified the court below in awarding the relief prayed.

It is insisted, however, that the court erred in admitting and considering incompetent testimony, and that, if this incompetent testimony is excluded, the competent testimony remaining will not support the decree of the court below.

It is first insisted that the court erred in admitting any of the statements made by Berry before the execution of the deed, and in support of this contention counsel for appellants cite cases holding that all antecedent propositions, correspondence and prior writings, as well as oral statements and representations, are deemed to be merged into the written contract which concerns the subject-matter of such antecedent negotiations when the written contract is free of ambiguity and is itself complete. To make the broad application of this rule of evidence which counsel for appellants here insist upon would result in denying reformation in any case. This rule of evidence does not apply when the agreement signed by the parties was executed through mutual mistake.

At § 2103 of Pomeroy's Equity Jurisprudence and Equitable Remedies, volume 5 (2nd Ed. 1919) page 4739, it is said: "It is the generally established rule in the United States that parol evidence of mistake is admissible in all cases and for all purposes, notwithstanding the fundamental doctrine of the law of evidence that parol proof is not admissible between the parties to vary a written instrument, and notwithstanding that the effect of the parol evidence may be to enlarge the scope of an instrument required by the statute of frauds to be in writing. 'The authorities all require that the parol evidence of the mistake, and of the alleged modification,

must be most clear and convincing, * * * or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of the evidence, but only upon a certainty of the error'."

The admissibility of such testimony has been frequently recognized by this court. *Cain* v. *Collier,* 135 Ark. 293; *Welch* v. *Welch,* 132 Ark. 227.

It is insisted that the testimony of Umsted is incompetent and inadmissible under § 4144, C. & M. Digest, and § 2 of the Schedule to the Constitution, which read as follows: "In civil actions, no witness shall be excluded because he is a party to the suit or interested in the issue to be tried. Provided, in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify thereto by the opposite party. Provided further, this section may be amended or repealed by the General Assembly."

The testimony shows that Berry died in 1921, and that his wife is also dead; that they had an only child named Parthenia, who intermarried with one Arthur Sewell, and two children were born of this union, one named Arthur W., and the other John W. Sewell. Parthenia is also dead, so that these children constitute the sole and only heirs of Albert Berry, who was the grantor in the deed here sought to be reformed. This suit for reformation was brought against these heirs and their father, and Umsted had had no transaction with any of them and did not testify as to any transactions had with them or concerning any statements made by them.

A syllabus in the case of *Lawrence* v. *LaCade,* 46 Ark. 378, reads as follows: "When the widow and heirs, and not the administrator of an intestate, are the parties to an action, the testimony of the adverse party of transactions

with the deceased is admissible. The widow and heirs are not within the proviso of section 2, schedule to the Constitution of 1874."

In *Williams* v. *Prioleau,* 123 Ark 156, Mrs. Prioleau brought suit in ejectment against the widow and heirs of Gabe Williams to recover a tract of land which had been conveyed to her by Williams and his wife. The answer alleged that the deed was in fact a mortgage, and the cause was transferred to the chancery court. Upon the trial there the plaintiff's husband, who had acted as her agent in the transaction, was permitted to testify concerning the transactions with Williams and his wife both before and after the execution of the deed. It was insisted that this testimony was incompetent under § 4144, C. & M. Digest, quoted above. This contention was disposed of by the court in the following language: "The objection that the testimony of Prioleau is incompetent as relating to transactions with deceased Gabe Williams is without merit, the suit not being against the executor or administrator of his estate. Section 3093, Kirby's Digest; *Bird* v. *Jones,* 37 Ark. 195; *Mosley* v. *Mohawk Lbr. Co.,* 122 Ark. 227." See also *People's Savings Bank* v. *McInturff,* 147 Ark. 296; *Britt* v. *Berry,* 133 Ark. 589; *Blackburn* v. *Thompson,* 127 Ark. 438; *Collier* v. *Trice,* 79 Ark. 414; *Strayhorn* v. *McCall,* 78 Ark. 209.

It is finally insisted that appellee was guilty of negligence and laches and is barred on this account. It is pointed out that Berry is now dead, and that the land, worth only $2 per acre at the time the deed was made, is now worth $500 per acre.

We do not think the testimony sustains this defense. It is true that the land claimed has greatly enhanced in value; but so also has the land described in the deed. Berry executed an oil lease on the west half of the northwest quarter of section 33, and, as appears from what has been said, this lease covered the land described in the deed and is effective as such for the reason that the deed sought to be reformed did not convey any one of the three forties owned by Berry, for, as has been said, that deed

described the land as being in range 16, whereas it is an undisputed fact that Berry owned no land in that range and did not intend to convey any there.

It is the presence of oil which gives all these three forties their great value. Berry executed a lease, which is valid, for the reason just stated, on the middle forty which his deed described, and which appellants say it was his intention to convey. It is apparent, therefore, that, if reformation is not granted, appellee will be compelled to take a forty incumbered with an oil lease which Berry had no right to execute, if he did in fact convey and intend to convey the middle forty.

The doctrine of laches has therefore no application here. The equity of the case is with appellee, for to deny him relief would permit appellants to enjoy the benefits of the consideration received for a lease on a tract of land which their ancestor had, according to their own contention, previously sold and conveyed to appellee.

The decree is correct, and is therefore affirmed.